## UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Case No. 3:13-cr-00054 (MPS) |
| | : | |
| v. | : | |
| | : | |
| DOMINIQUE MACK, | : | |
| | : | |
| Defendant. | : | |

_____

### RULING ON DEFENDANT MACK'S MOTION IN LIMINE TO EXCLUDE MACK'S POST-ARREST STATEMENT

A federal grand jury has indicted Dominique Mack for witness tampering/homicide offenses as well as offenses charging the possession of a firearm by a convicted felon. These charges stem from Mack's alleged efforts to avoid apprehension on earlier drug trafficking charges on which he was indicted in September 2010.

Mack has filed a motion in limine (ECF No. 281) seeking to suppress his post-arrest statement that he had seen his "wanted" poster distributed by the Federal Bureau of Investigation ("FBI"). Mack argues that he made the statement in response to custodial interrogation and before being advised of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). The Court held an evidentiary hearing on March 28, 2016, at which the sole witness was Special Agent Ryan James ("SA James") of the FBI. For the reasons set forth below, the Court GRANTS Mack's motion.

## I.     FINDINGS OF FACT

In September 2010, a federal grand jury returned an indictment charging approximately thirty-three people—including Mack—with drug trafficking and firearms violations. The Government arrested most of those indicted, but some of the defendants, including Mack,

remained at large, and efforts to locate them were ongoing. On June 15, 2011, after receiving no answer to a knock, several FBI agents used a ram to enter an apartment at 36 Vine Street. They were looking for Mack—who until then had eluded arrest—and they entered the apartment with their weapons drawn. SA James said that the agents found Mack standing in the doorway of the master bedroom; he was alone in the apartment. The agents approached Mack, and told him to get down. Mack complied, and they handcuffed him. One of the agents asked Mack for his name. Mack responded, "you know my name." The agent asked again for his name and Mack responded, "Dominique Mack." The agents brought Mack into the living room, and while they searched him, Mack said, "all this over a phone count and marijuana?" Mack's utterance was not in response to a question by the agents. The agents said nothing else to Mack and he made no further statements while they were in the apartment.

The agents then transported Mack to the U.S. Marshal's office for processing. SA James was not in the same vehicle as Mack, but when they arrived at the federal building, SA James took Mack upstairs to the U.S. Marshal's office. In the presence of Deputy U.S. Marshal Matt Duffy, who was processing Mack, SA James asked Mack if he had seen his FBI "wanted" poster. Mack responded that he had seen the poster online.

At the hearing, SA James testified that he had asked Mack whether he had seen the poster out of professional curiosity: "We publish those posters months prior and we posted that poster all along the north end of Hartford and in particular lower Vine Street so I was curious to see if he saw it." The "wanted" posters are also published on the FBI's main website and the FBI's New Haven website. On the day of the arrest, June 15, 2011, SA James had no reason to believe that Mack was involved in the murder of Ian Francis, for which he is charged in this case.

On cross examination and in response to questions from the Court, SA James confirmed that he was not conducting a formal interrogation of Mack by asking specific questions about the narcotics trafficking conspiracy for which Mack was arrested. Mack was handcuffed and sitting in a chair, and SA James was standing about five to six feet in front of Mack when he asked the question regarding the "wanted" poster. SA James agreed that agents ask and defendants respond to questions during the normal course of processing, but he did not remember those "booking" questions and answers on that day.

## II.    DISCUSSION

At the hearing, defense counsel confirmed that Mack makes no Sixth Amendment claims with respect to the statement about the "wanted" poster, and makes no Fifth Amendment claim with respect to the statements Mack made in the apartment. Therefore, the only issue is whether the admission in evidence of Mack's statement that he had seen the "wanted" poster online would violate his rights under the Fifth Amendment, as construed under *Miranda* and its progeny.

"An interaction between law enforcement officials and an individual generally triggers *Miranda*'s prophylactic warnings when the interaction becomes a 'custodial interrogation.' This determination has two parts: (a) there must be an interrogation of the defendant, and (b) it must be while []he is in 'custody.'" *United States v. FNU LNU*, 653 F.3d 144, 148 (2d Cir. 2011) (citations omitted). There is no dispute that Mack was in custody and had neither been read—nor waived—his rights under *Miranda* at the time he made the statement at issue. Therefore, the sole issue is whether SA James's question about the "wanted" poster constituted "interrogation" within the meaning of *Miranda*.

Interrogation "must reflect a measure of compulsion above and beyond that inherent in custody itself." *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980).

> *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

*Id*. at 300-01. I find that SA James's question was one that he should have known was reasonably likely to elicit an incriminating response from Mack, and therefore one that must be suppressed.

Courts must "consider police conduct in light of the totality of the circumstances in assessing whether the police 'should have known' that their actions 'were reasonably likely to elicit an incriminating response.'" *Acosta v. Artuz*, 575 F.3d 177, 191 (2d Cir. 2009) (quoting *Innis*, 446 U.S. at 303). "An 'incriminating response' refers to 'any response—whether inculpatory or exculpatory—that the prosecution may seek to introduce at trial.'" *United States v. Chandler*, No. 15-CR-131 (ADS), 2016 WL 614679, at *14 (E.D.N.Y. Feb. 12, 2016) (quoting *Innis*, 446 U.S. at 301 n.5).

The question posed by SA James to Mack—who had eluded arrest on an indictment for over nine months—was one SA James should have known was "reasonably likely" to elicit evidence of Mack's awareness of the fact that he was "wanted" by the FBI on criminal charges. That fact, combined with evidence of Mack's success in eluding apprehension, would potentially have been admissible against him in any trial of the drug charges as evidence of consciousness of guilt. Evidence of flight or attempts to avoid capture may be presented at trial as evidence of consciousness of guilt. *See Sampson v. Conway*, 386 F. Supp. 2d 173, 181 (W.D.N.Y. 2005) (noting, in analyzing a habeas claim, that prosecution had argued that evidence that defendant

4

asked someone for money and—when he was arrested—asked the police how they managed to find him, demonstrated plan to avoid capture and consciousness of guilt). While "[i]t is well-settled that flight can, in some circumstances, evidence consciousness of guilt . . . a satisfactory factual predicate must exist from which the jury can infer consciousness of guilt from flight." *United States v. Al-Sadawi*, 432 F.3d 419, 424 (2d Cir. 2005); *see United States v. Candelaria-Silva*, 162 F.3d 698, 705 (1st Cir. 1998) ("Evidence of a defendant's flight and attempts to conceal or falsify identity may be presented at trial as probative of a guilty mind if there is an adequate factual predicate creating an inference of guilt of the crime charged."). The probative value of flight evidence as circumstantial evidence of guilt depends on "the degree of confidence with which four inferences can be drawn: (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged." *Al-Sadawi*, 432 F.3d at 424 (citations omitted). In this case, it is unclear whether the Government would have been able to convince a trial judge that each of these inferences could be drawn. Nevertheless, it is at least plausible that, had Mack gone to trial on—instead of pleading guilty to—the drug charges in the 2010 indictment, the Government could have introduced Mack's admission that he knew that he was "wanted" for the federal drug charges, together with evidence that federal agents had been looking for him for nine months, to support an inference of consciousness of guilt. *See Candelaria-Silva*, 162 F.3d at 706 (finding that district court did not abuse its discretion in admitting evidence of flight and continued absence because there was an adequate factual predicate including that defendant admitted "after his arrest that he knew he was wanted in Puerto Rico"); *People v. Butts*, 175 Misc. 2d 709, 713 (Sup. Ct. 1998) (suppressing defendant's statement in response to detective's question, "This is

you, right?", which detective asked while holding up poster stating, "WANTED FOR

HOMICIDE"; "defendant was asked, in effect, to acknowledge that he had known that he was

being sought by the police for murder. Such an acknowledgment . . . might be evidence of

consciousness of guilt, because an awareness of being wanted would be evidence that he had

consciously been hiding out.").

I need not decide whether Mack's statement that he saw his "wanted" poster would

actually have been admissible in his underlying drug case; it is enough that the question

regarding whether he had seen the poster was reasonably likely to produce an incriminating

response. Because the question touched on subject matter potentially leading to evidence of

consciousness of guilt, it plainly was. Thus, SA James should have known that his question was

reasonably likely to elicit an incriminating response from Mack. It is true that, at the time, SA

James did not know, and had no reason to know, that any response to his question would

incriminate Mack on the charges in *this* case—because James was at the time unaware of any

connection between Mack and the Francis shooting. But none of the cases suggest that the *Innis*

test is charge specific. And SA James was aware of then-pending charges as to which the

response to his question was reasonably likely to incriminate Mack.[1]

Although it is relevant that SA James asked the question out of professional curiosity—

and not for any investigative purpose—his intent is not conclusive. *Chandler*, 2016 WL 614679,

at \*14. "The subjective intent of the agent is relevant but not conclusive and the relationship of

the question asked to the crime suspected is highly relevant." *United States v. Casiano*, 862 F.

Supp. 52, 54 (S.D.N.Y. 1994) (internal quotation marks and citations omitted). In *United States*

---

[1] I am not suggesting that SA James was seeking to trick Mack or that he otherwise behaved inappropriately—just that, under all the circumstances, the question he asked was objectively reasonably likely to produce an incriminating response.

*v. Thomas*, the court admitted a defendant's statement in response to an officer's question that was a "product of curiosity." In that case, however, unlike this one, "the conversation was initiated when [the defendant] began to 'mutter' about the incident," and the court concluded that the officer's inquiry in response to the defendant's muttering "can thus be viewed as more 'the product of curiosity' than the result of a purposeful interrogation." 961 F. Supp. 43, 45 (W.D.N.Y. 1997). Moreover, in that case, the defendant also made an incriminating statement that went beyond the officer's question and "was a voluntary spontaneous utterance unprompted by [the officer's] initial query." *Id.* at 46. "Volunteered information . . . does not implicate *Miranda* even when the speaker is in custody." *United States v. Broughton*, 983 F. Supp. 2d 224, 231 (E.D.N.Y. 2013). Here, Mack's statement was not voluntary or unprompted; it was made in response to SA James's question, and it did not go beyond the scope of the question. Mack did not volunteer any additional information beyond answering—in the affirmative—SA James's question about whether he had seen his FBI "wanted" poster. Similarly, SA James's question and Mack's answer were not part of small talk or casual conversation about family, sports, the weather, or another general topic. *See United States v. Jacobson*, 4 F. Supp. 3d 515, 533 (E.D.N.Y. 2014) ("SA Ricciardi's small talk about the weather and his family, for instance, were not reasonably likely to elicit an incriminating response"); *Mickey v. Ayers*, 606 F.3d 1223, 1235 (9th Cir. 2010) ("Casual conversation is generally not the type of behavior that police should know is reasonably likely to elicit an incriminating response."); *United States v. Tail*, 459 F.3d 854, 858 (8th Cir. 2006) ("Polite conversation is not the functional equivalent of interrogation.").

　　Mack's statement also does not fall into the exception under *Miranda* for answers to routine booking questions about biographical data and basic identifying information that "appear reasonably related to the police's administrative concerns." *Pennsylvania v. Muniz*, 496 U.S.

582, 601-02 (1990). "Whether the information gathered turns out to be incriminating in some respect does not, by itself, alter the general rule that pedigree questioning does not fall under the strictures of *Miranda*." *Rosa v. McCray*, 396 F.3d 210, 221 (2d Cir. 2005) (citing cases). SA James's question was clearly outside of the scope of routine pedigree questions and basic identifying information such as name, date of birth, age, race, height, weight, eye color, and hair color. *See id.*; *see also Chandler*, 2016 WL 614679, at *16 ("Routine booking questions are those designed to elicit an arrestee's pedigree, such as the arrestee's name, aliases, date of birth, address, place of employment, and marital status.").

Thus, under the totality of the circumstances of this case, SA James's question could be construed as reasonably likely to elicit an incriminating response. This is not a case in which SA James made a casual comment, and Mack voluntarily or spontaneously responded. Because Mack had not been given *Miranda* warnings, the Government may not introduce at trial Mack's statement that he had seen the "wanted" poster online.

III.     CONCLUSION

For the foregoing reasons, the Court GRANTS Mack's Motion in Limine (ECF No. 281).


**SO ORDERED** this 7th day of April, 2016, at Hartford, Connecticut.


_____/s/_____
Michael P. Shea
United States District Judge